## ASHLEY v. HOLMAN.

1. In action by the committee of a lunatic against the executors of a former committee for an account of the value of services rendered by the lunatic, the Circuit Judge found that such services were rendered and fixed their value, and that these services were enforced for the committee's profit. On appeal, this court sustained the first finding because not wholly without evidence to support it, but reversed the other finding as without testimony and not a natural or necessary inference from the facts proved.

2. The questions adjudicated in the former appeal in this case, *Ashley* v. *Holman,* 15 *S. C.,* 97, stated.

3. If the committee of a lunatic exacts valuable labor from his ward, for his own profit and benefit, he is liable to account for the value of such labor; but if the service is enforced only for the proper discipline and healthful employment of the ward, the committee is not liable, notwithstanding incidental benefit to him therefrom.

Before FRASER, J., Barnwell, March, 1885.

This was an action by Joseph Ashley, committee of William Ashley, against W. A. Holman and W. A. Bailey, executors of William Ashley, sr., deceased. The Circuit decree, omitting the statement of facts to be found in the opinion of this court, was as follows:

This being a case in which a trustee is called to account, and in which the claim is founded on the duties growing out of that relation and not upon a contract, and no attempt made to settle with the ward or his committee, until the payment of the two thousand dollars, not long before the commencement of this

action, there is nothing on which to found a plea of the statute of limitations in this case. The ward was no party to the application to the Judge of Probate, in reference to the making of annual returns, and is not bound by anything in it.

It is probably true that William Ashley, the elder, never dreamed that he was making himself liable to account for the services of his ward; but if he has made a mistake, it is not an unusual experience of trustees in their dealings with the matters committed to their care.

An examination of the record of the proceedings under which William Ashley, the elder, was appointed committee of his son, William Ashley, jr., and in which the order of maintenance was also made, does not, as I understand them, show that the order of maintenance in any way had reference to the mode in which the ward had been managed by his father, or was in future to be managed by him as the committee. Their legal effect on this point does not differ from what it is, as the same proceedings and order are set out in the complaint. As they were described in the complaint, the Supreme Court holds that they are no bar to this action. *Ashley* v. *Holman*, 15 *S. C.*, 97. The only questions before the court were as to the mental capacity of William Ashley, jr., his fitness to control himself and manage his estate, as to the value of his estate and the amount necessary for his support and maintenance. There was enough for this latter purpose, and the court allowed that and no more. The court did not inquire if he could labor and earn wages, and it did not then seem necessary to do so.

Only questions of fact now remain to be disposed of: 1. Was the ward capable of rendering valuable services as alleged? 2. Did he render such services to his committee? 3. Were they required merely as necessary or proper discipline? 4. What, if any, was their value?

It will be impossible to discuss the testimony in detail, and I am at the disadvantage of not having seen the witnesses, and not having the aid of the master by his own judgment as to the conclusions to be derived from the testimony. It may be said, however, that the testimony of the two distinguished physicians who have been examined by commission refers to a hypothetical case,

which is not exactly the case now before the court. They, however, only give their opinion. On the other side, it might be said with at least some plausibility that there are many cases of mere idiocy where human ingenuity could utilize mere physical force and power even where the mind was gone, and even extraordinary mental powers are sometimes strangely joined in a person who would be a proper subject to be made a ward of chancery. If such an unfortunate should be able and should in fact engage in profitable employments, he should labor for himself and not his committee.

The great preponderance of testimony is to the effect that the ward did render valuable service to his father and committee during the whole time the relation of ward and committee existed between them, and which services would have been rendered by some one else, either slaves or hirelings, if not rendered by him. Even in the last sickness of the father, when the tenderest care was due from all around him, the ward seems to have been trusted to perform important duties around his bedside, and this must have been with the knowledge of the family. I am not sure that the committee ought to be allowed to enjoy without account the services of his ward, even if such services were the best thing for his health and discipline, if these services had a money value over and above the cost of producing them. I am quite sure that the committee should account if the benefit to the ward was merely incidental, as I am inclined to think it was in this case.

The labor of the ward in this case was constant; and it was enforced under circumstances which, if not painful to himself, must have been so to those who took an interest in him. The chastisement which seems frequently to have been inflicted for mere neglect of duties required, was never, so far as appears from the testimony, inflicted after the day's work was over, to keep his ward from straggling away from his father's dwelling to places where he did not want him to go. The impression made on my mind by the testimony is not that there was any intentional unkindness towards the son, but that the father had become accustomed to his son's infirmities and gave way to his own, perhaps, ruling passion, to economize and utilize all available labor

about him. The testimony for the defence has been mainly of a negative character, and not sufficient to overcome the plaintiff's case.

When witnesses testify as to the value of services, they, to this extent, give their opinions, and it is the duty of the court to weigh their opinions in the light of the personal experience of the judge who tries the case. Two hundred dollars a year would have been, during all these years, a full compensation for the ablest of field hands and somewhat over the average for what was known as a full hand on a plantation. A full hand would not have been willing to do for less than any other work such as was required of the ward in this case. This, however, is not the test. What could this labor have been procured for? All the work done by him was such as was usually done by the inferior laborers on the plantations and who were scarcely half-hands—hands clothed and fed, not as a member of Mr. Ashley's family and at his table, but with such food and clothing as were usual on such plantations amongst the laborers, and at first cost. I think, therefore, that an average of one hundred dollars a year will be a fair allowance for the value of these services. Assuming, therefore, that the committee was chargeable with these services, at the rate of one hundred dollars a year, at the end of each year, and allowing on these sums simple and not annual interest, and deducting commissions, the plaintiffs are entitled to a judgment for that amount—the sum of five thousand one hundred and fifty dollars.

It is therefore ordered and adjudged, that the defendants, as executors of William Ashley, the elder, deceased, do pay to the plaintiff, as committee, or guardian, of William Ashley, jr., of unsound mind, the sum of five thousand one hundred and fifty dollars and the costs of this action.

From this decree the defendants appealed upon the grounds substantially stated in the opinion.

*Messrs. Robert Aldrich* and *S. W. Melton* for appellants.

*Messrs. John J. Maher* and *Isaac M. Hutson*, contra.

November 22, 1886.   The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON. In a former appeal in this case, involving the judgment of the Circuit Court, sustaining a. demurrer to the complaint, this court, reversing the judgment below in that respect, decided that the order in chancery, dated in 1855, by which the testator of the defendants had been appointed the committee of William Ashley, the younger, and under which he was allowed the annual interest on the estate of the said William for his board and maintenance, did not in itself preclude a claim for compensation, on behalf of the said William, for services rendered said committee, after the relation of committee and ward had been established, if in fact the said William had rendered to his committee services of a character and under such circumstances as would entitle him in law to such compensation. The court further held in substance that while it was almost inconceivable that an incurable lunatic could earn wages by his labor, yet that this was a matter which would depend upon the facts of each case, and if in any case wages had been justly earned by valuable services rendered by such lunatic, and exacted for the profit of the committee, that the doors of the court should not be shut against him because of his lunacy; and that in such case, where an action like the one below had been brought claiming an accounting from the estate of said committee, it could not be dismissed on the ground that the complaint did not state facts sufficient to constitute a cause of action. And the case was then remanded to the Circuit Court under the above rulings.

Upon the case going back it was heard and tried by his honor, Judge Fraser (upon a mass of testimony taken by the master, all of which appears in the "Case"), who found the following facts: First. "That said lunatic did render valuable services to his father (the committee) during the whole time the relation of ward and committee existed between them." Second. "That said services were such as were usually done by inferior laborers, scarcely half hands, and therefore worth half wages, to wit,: $100." Third. "That it was probably true, that William Ashley, the elder, never dreamed that he was making himself liable to account for these services." And fourth. That said services were enforced by the committee, not so much for the discipline and health of the ward, as for the reason that the father (com-

mittee) "had become accustomed to his son's infirmities and gave way to his own ruling passion, to economize and utilize all available labor about him." In other words, as we understand this last finding, that the services of the ward were enforced for the profit of the committee, benefit to the ward being merely incidental. Upon these facts, his honor held that the estate of the committee should account, saying that he was not so sure but that it should still account even if said services had been enforced as a matter of discipline, and healthful exercise only. Whereupon he ordered and adjudged, that the defendants, executors of William Ashley, the elder (former committee), do pay the plaintiff, present committee, the sum of $5,050, and the costs of suit.

The appeal questions the correctness of his honor's findings of fact, denying upon the evidence the capacity of the lunatic to render service, that he rendered service of the value fixed by the judge, and also that said services were enforced for the profit of the committee, under the influence of a ruling passion to economize and utilize all available labor about him, instead of for the proper discipline of said lunatic—the appellants contending that the service rendered by the son was enforced by the father chiefly from a desire to promote the health and happiness of said son, said services having no real value to the father, because otherwise, what was done by him would have been done by his regularly employed servants and the "trash gang" without additional expense to the father, and that his honor should have so found.

The appeal also questions the principle of law which his honor applied to the facts as found, to wit: that although no contract, either express or implied, in the sense that both parties should assent thereto, could arise, one of the parties being *non compos* and therefore unable to assent, yet that a legal obligation independent of contract could and did exist here, arising out of the duty of the committee to charge himself with the value of the services received by him at the hands of his ward, upon which the action could be sustained—the appellant contending besides, that the service rendered here was rendered in the relation of parent and child, not for the benefit of the parent, and with no intention, expectation, or promise express or implied on the part of the parent to pay for them, and therefore they should

have been held gratuitous, and not susceptible of raising a charge.

Now, can the findings of fact below be sustained? is the first matter before us. We have carefully gone over the testimony reported in the "Case," voluminous and extensive as it is, and, guided by the light of those numerous cases of ours, in which it has been held that the findings of fact by the Circuit Judge will be sustained unless there is either an entire absence of evidence to support them, or the manifest weight thereof is otherwise, we have reached the conclusion that the facts found as to services being rendered by the ward to his committee, and as to their value, are not entirely without testimony, and they, therefore, must be regarded as established. There was very strong testimony the other way, however, so much so, indeed, that in attempting to balance the evidence on both sides, with the view to ascertain the preponderance, it is difficult to see how the conclusions below were reached, except that more reliance was placed in the witnesses of the plaintiff as a whole than upon those of the defendants. In fact, the testimony offered by the defendants was so strong in opposition to the plaintiff's claim, that respondent's distinguished counsel frankly admitted in his argument here, "That if the testimony of these witnesses (alluding to certain witnesses of the defendants just named by him) is to be relied on implicitly, as a truthful representation of the facts, the case of the plaintiff has not been established." Saying further: "That the little that William did in the way of required and enforced service according to this testimony could have been of no value to the committee, and might well be considered only the necessary and healthful discipline to which he should have been subjected as contributing to his physical comfort and health." The contest, then, must have been very close, and might have turned either way, depending upon the estimate in which the testimony on either side was held by the Circuit Judge. Notwithstanding this, however, the findings of the Circuit Judge, mentioned above, having evidence to support them, must be sustained, under the rule in such cases.

But the other important finding, that these services were enforced by the committee upon his unfortunate son, for his own

profit, under the promptings of a ruling passion to economize and utilize all available labor about him, rather than for the discipline, health, and happiness of said son, we do not sustain, because after a careful analysis of plaintiff's testimony, we fail to find any evidence supporting it.   True, there is abundant testimony on the one side, that the son did do many things in and about the house, yard, and horse lot, such as making fires, cutting and hauling wood, shucking corn, feeding and watering horses and other stock, seeing to the barn keys, and doing other small chores about the premises, and also that these to a great extent were required and enforced by the father, and that they were of some value to him; but we find no testimony as to the motive of the father in enforcing said service.   The witnesses who speak of the fact, say nothing as to the motive, and there is certainly no direct or positive testimony on that subject from the plaintiff.

Nor do we think such finding is a reasonable or natural inference from the other facts of the case, in the face of the evidence that William Ashley, the elder, was a man of large fortune, owning, up to emancipation, over 150 slaves, with an abundance of personal property of all kind, and no doubt a large landed estate, and the father of the unfortunate lunatic, of whose estate and person he had very properly been appointed the committee.   Can it be, that with these surroundings, and with no need for the labor of his son, he was so lost to all the promptings of parental affection, not to say of common humanity, as to be willing to make a degraded menial servant of him, and for no other reason than for profit to himself?   We cannot think so.   We cannot think that this is a legitimate inference from the facts that service was rendered, that it was enforced, and that to some extent it was valuable in the sense that others would have had to render it if the son had not—to which extent the testimony of the plaintiff goes, but no further.

It must be remembered that William Ashley, the elder, is in his grave.   This action has been instituted since his death.   In his life he never dreamed that he would be expected to account. And it does not appear that he ever gave any full explanation to any one as to the government of his son and the purpose he had

in view in requiring him to be employed.    But the fact that he
was silent upon this subject to his overseers, his slaves, and hired
laborers, adds nothing to the probability of the inference men-
tioned.    But he was not entirely silent.    The picture which Mrs.
V. V. Holman gives of the condition of his son and what the
father said, when he attempted to keep him from the negro quar-
ter, and prevent him from drawing water, cutting wood for the
negroes, and nursing their children, is striking and significant,
and furnishes to some extent a key to the conduct of the father.
She said: "He tried the plan of making him stay in the house
and to divert him there; but nothing he could do could interest
or amuse him.    He would sit with his head drooped, the picture
of despair.    *    *    And her father said, that plan would not do—
that he would pine away and die."    There being no direct testi-
mony upon this point, and the inference drawn not being a neces-
sary or natural one from the facts proved, we feel constrained,
under the authority of the cases above referred to, to overrule
said finding.

Now the question arises, whether under the facts before this
court, the judgment below can be affirmed?    This raises the legal
question, when and under what circumstances can a lunatic earn
wages, chargeable upon his committee?

Before proceeding, however, to this question, it would be well
to determine the points settled on the previous appeal,[1] and there-
fore needing no further examination here.    The precise point
brought up in the exception in that appeal, and which this court
adjudged definitely, was, whether the order in chancery of 1855,
appointing William Ashley, the elder, committee of his son, pre-
cluded all claim for services rendered, if any, by said son.    This
court held that it did not, overruling the judgment below.    That
question is therefore *res adjudicata* here.    This court also, in
response to the argument of the appellant, in which an effort was
made to sustain the judgment below, on the ground that the ward
being *non compos* could not make a contract, and therefore on
that account there could be no cause of action in his behalf, even
though the order in chancery above did not preclude his claim,
held that this was not sufficient, and that notwithstanding no

---

[1] *Ashley* v. *Holman*, 15 *S. C.*, 97.

contract could be made between the parties, in the sense that both should assent thereto, one of them being *non compos*, and therefore unable to assent, yet that the law might raise an obligation between such parties, independent of contract to pay for services rendered. The court, however, did not determine or specify the conditions upon which such obligation would arise, or the character of cases in which it would be enforced. It simply adjudged the question that it was not impossible for a *non compos* to earn wages; or rather the fact of one being *non compos* did not in itself shut the doors of the court against him. This last question, it is true, was not distinctly raised in the appellants'. exceptions in the former appeal, but we think it was raised sufficiently in the argument to prevent our utterances thereon from being entirely *obiter*. At all events, upon further reflection, we see no reason to change or modify our opinion then expressed. These matters are therefore dismissed, and we will now proceed to the question, whether the facts before the court bring the case under any principle of law which can sustain the judgment below.

We have examined, as far as practicable, all text books and reported cases within our reach, and, singular to say, while we have found the law to be that a *non compos* may be held liable to others for services of a certain character, to wit, necessaries furnished, medical attention, &c., on the ground of an implied contract, notwithstanding his admitted incapacity to make a contract, yet we have found no case where others were held liable to him for services rendered. Nor have the distinguished and zealous counsel in the cause referred us to any case where the precise question here has ever before been presented to the courts. Coming in this shape, then, before us, it has been exceedingly embarrassing, and its decision either way has been surrounded with difficulties, and especially so on account of the possible influence which the decision one way or the other may have upon the happiness of that unfortunate class of persons in behalf of one of whom in the person of William Ashley, the younger, this question for the first time in the history of our judiciary has been raised.

To lay down the rule that a committee can work his afflicted ward constantly, indiscriminately, and for his own pecuniary

profit, and yet pay him nothing, nor account in any way to his estate, because he cannot make a contract, would be a principle not only dangerous to this strick'en class, but shocking to every sense of justice. And yet, on the other hand, to hold that a committee is to be held to a strict account and made to pay for every service rendered by his ward, as if no such relation as that of committee and ward existed, and without regard to the object had in view by the committee in requiring the service, and that, too, after the lapse of years, during all of which time the committee had never conceived that he was imposing upon himself such an obligation, as in this case, would be dangerous to the committee, and besides would in a great degree destroy the purposes of his guardianship, preventing the exercise of proper discretion in the discipline and control which should be administered, and the plan which he should adopt in the government of his ward.

In the absence of direct authority and with no case before us where the question here has been considered and discussed, we are left to general principles as applied in analogous cases, and we do not see why the principle enforced against a lunatic for necessary services rendered him, should not be applied in his favor, where he has rendered necessary service to another. Nor why his committee should not be responsible where the evidence is plain that he has enforced and accepted such service for his own benefit and profit. The laborer is worthy of his hire, and if one having control of a *non compos,* who is unable to contract, yet able to do valuable work, enforces that labor for his own benefit, he should not escape responsibility. If, however, the service has been enforced by the committee not for his profit, but for the proper discipline and healthful exercise and employment of the ward, as the best thing to be done for his comfort and happiness, although with incidental benefit to the committee, we see no ground for accountability, and especially so in a case like the one at bar, where the committee was the father of the ward, was a man of large fortune, in no way in need of the service rendered, had no idea that he was annually creating a debt against himself, which was to be enforced against his estate after his death, when he would have no opportunity to meet the claim by explanation, counter-claim, or otherwise, and when, too, although

he bequeathed nothing directly to his said son, he yet charged his whole estate with his comfortable support and maintenance.

Our conclusion is, that while the Circuit Judge was not in error as to the principle of law which he applied to the facts as found by him, yet one of those facts being overruled, and that fact being the one which made the law enforced applicable, the judgment becomes erroneous.

It is therefore the judgment of this court that the judgment of the Circuit Court be reversed.